# Monongahela Navigation Company *against* Coons.

The license allowed by the Statute of 1803 to the owners of lands adjoining navigable streams declared by law to be highways, to erect dams in them for mills or other water-works, provided they do not injure the navigation or prevent the fish from passing, is not indefeasible, but subordinate to the right of the Commonwealth.

The Legislature may constitutionally incorporate a company to make a lock and slackwater navigation without requiring it to make compensation for consequential damage to private property in the execution of the work: *held,* therefore, that the Monongahela Navigation Company, incorporated to make such a navigation from Pittsburgh to the line between Pennsylvania and Virginia, by dams and locks in the Monongahela river, was not liable in an action on the case, for obstructing the water in the Youghiogeny river by a dam in the Monongahela, to the injury of the plaintiffs' mill.

THIS was an action on the case in the District Court of *Allegheny* county, brought by Adam Coons and David Coons against the Monongahela Navigation Company, for obstructing the water in the Youghiogeny river and injuring the plaintiffs' mill. The defendant is an incorporated company, and authorized by its charter to erect dams in the Monongahela river for the purpose of a lock and slackwater navigation between Pittsburgh and the Virginia State-line. One of these dams obstructed the water in the Youghiogeny, to the injury of the plaintiffs' mill, at the distance of five or six miles from its confluence. The only provision

for compensation of damage in the act of incorporation, is contained in the 8th section, and relates exclusively to injuries done by entering on shore lands, and taking away the rocks, stones, earth and gravel. The 16th section originally provided that nothing contained in the charter should " impair any right, privilege or legal claim, which may have been granted to any individuals by any Act of Assembly heretofore passed for erecting mill-dams in said river" (the Monongahela); but the owners were required to make their dams links of the chain of works, and authorized to demand a proportionate part of the tolls. There was no saving of the rights pertaining to the owners of mill-dams in the tributary streams; and this 16th section had been repealed. There was, therefore, no provision for consequential injuries of any sort.

By the statute of 1803 it is enacted that persons owning the shores of navigable rivers declared by law to be highways, may erect dams in them for mills or other water-works, " provided that the said person or persons, in erecting the said dams or in keeping them in repair, shall not obstruct or impede the navigation of said streams, or prevent the fish from passing up the same." The plaintiffs' mill-dam was constructed in conformity to this proviso; and it was urged that the privilege, requiring, as it did, an expenditure of labour and money in permanent erections for the enjoyment of it, was founded on a contract which no subsequent act of legislation could impair; and that the constitutional power of the State was incompetent to exempt its agent from the payment of consequential damages for an injury done to private property, without compensation made or security for it tendered. The court below being of that opinion, there was a verdict and judgment for the plaintiffs.

*Williams*, with whom was *Williamson*, for plaintiff in error.

The first question is whether the Youghiogeny is a navigable public river? By the common law or custom of Pennsylvania, differing in this respect from the common law of England, but corresponding substantially with the doctrine of the civil law, which regards all rivers, where the flow of water is perennial, as belonging wholly to the public, (*Inst.* 2, 1, 2, *Dig.* 43, *tit.* 12, 13, 14, 15), the navigability or public character of a river or other stream of water depends, not on the flux and reflux of the tide, but on its capacity for public use as a commercial highway; *Carson* v. *Blazer*, (2 *Binn.* 475) ; *Shrunk* v. *Schuylkill Navigation Company*, (14 *Serg. & Rawle* 79) ; and on this ground all our " principal" rivers, among which the Youghiogeny is expressly included by Chief Justice TILGHMAN, in his enumeration of the rivers in the case last cited, have been so classified and recognised by our courts. The uniform solicitude evinced on this subject by the Legislature from the earliest period of our colonial history, is evidence of a common understanding entirely in harmony with the

doctrine settled in the above cases. The Act of 1700, "prohibiting the erection of weirs;" (1 *St. Laws* 21); the Act of 14th August 1725, interdicting the construction of bridges; (1 *St. Laws* 168); the Act of 9th March 1771, "declaring the Susquehanna a public highway;" (1 *Sm. Laws* 324); and other Acts cited by BRACKENRIDGE, J., in *Carson* v. *Blazer*, show the extent of the public claim over the waters of this State. The language of these Acts, moreover, proves that this claim was not limited by the quality of the vessels actually employed, or by the natural condition of the channel. It extended even to canoes, and kept always in view the capabilities as well as the existing uses of the stream. It was enough for the Legislature that it could be made navigable.

The magnitude and capabilities of the Youghiogeny river for the purposes of commerce, during a portion of the year at least, together with the fact that the inhabitants of a neighbouring State, from which it is derived, have always enjoyed the right of free passage upon its waters, would seem to entitle it to the denomination of a public navigable river within the meaning of our common law. But the Legislature of this State have already settled this question. By an Act of the 13th April 1782, (2 *Sm. Laws* 43), in accordance with the policy already indicated, and in affirmance only, as it is believed, of the common law, they have expressly declared the Youghiogeny river a public highway as far up as it had been or could be made navigable for rafts, boats and canoes. And that they have since uniformly regarded and treated it as such, is evinced by the passage of divers Acts establishing ferries, authorizing the construction of dams, (under certain important limitations as to the right of passage), and making appropriations for its improvement. Act of 11th March 1784, authorizing John Sumrall to establish a ferry; Acts of 27th March 1795; 26th February 1796; 22d March 1803, and 2d April 1822, authorizing the erection of dams; and the Act of 10th April 1792, "for improving navigable waters."

A correspondent understanding, on the part of the profession, also, is established by the fact that in the case of *Chambers* v. *Furry*, (1 *Yeates* 167), decided as early as 1792, the Act above referred to, authorizing John Sumrall to establish a ferry, was relied on as a constructive legislative denial of the right there asserted, of landing upon the freehold of another on the bank of a navigable river.

If, then, the Youghiogeny river be a navigable public highway, either at common law or under the statutes of this Commonwealth, the plaintiffs' dam is a public nuisance, and abateable as such, unless erected under a license from the sovereign, and not interfering with the public right of way. It is a well-settled principle of public law, that all navigable rivers belong to the sovereign, and no individual has a right to obstruct them. 10 *Mass.* 70. They claim, however, a right to erect and maintain their dam under the

[Monongahela Navigation Company v. Coons.]

authority of the general Acts of 22d March 1803, and 2d April 1822, " authorizing owners of lands adjoining any navigable stream of water declared by law a public highway, to erect and maintain dams adjoining their own lands, and also to lead off thereby so much of the water as might be necessary for their mills or other water-works; provided that in erecting the said dams they should not obstruct or impede the navigation," &c. This right of erecting dams and diverting the water for specific purposes, the defendants have not disputed, nor have they interfered in any way therewith.

But the plaintiffs insist further, and they have so declared, that they are entitled to the natural flow of the stream or the water-power, which the defendants, an incorporated company, acting within the authority of their charter, have obstructed by their erections; and this is the gist of their complaint. Have they any such right under the Act of Assembly authorizing the construction and maintenance of their dam? If they have, they must show it. I maintain that they have not; because, 1, it is not in their grant; and 2, if it were, it was not competent to the Legislature to bestow it. The grant is of a privilege to land-owners to erect and maintain dams provided they do not obstruct or impede the navigation. It contains nothing in relation to the water-power; and neither that nor the soil of a navigable river was ever intended to be given away by the Legislature. *Carson* v. *Blazer*; *Shrunk* v. *Schuylkill Nav. Co.*; *Commonwealth* v. *Fisher*, (1 *Penn. R.* 467); *Ueberoth* v. *Lehigh Nav. Co.*, (7 *Haz. Reg.* 292).

If a right to the water-power, therefore, passes under this grant, it must be by mere implication. But such grants are to be construed strictly; because, 1, they are by the sovereign; 2, they are in derogation of common right; and, 3, they are without consideration, being matter of pure donation flowing from the bounty of the Commonwealth. "A subject's grant shall be construed to include many things besides what are expressed, if necessary for the operation of the grant. But the King's grant shall not enure to any other intent than that which is precisely expressed." It shall rather fail of effect. 2 *Black. Com.* 347–8. The same rule of construction has been vindicated by Sir William Scott, (Lord Stowell), in 5 *Rob. Adm. R.* 182, as founded in wise policy, " because grants from the crown are made by a trustee for the benefit of the public, and no alienation should be presumed that was not clearly and indisputably expressed." It has, moreover, been solemnly recognised in numerous cases in this country, and the two last-mentioned considerations concurring here, render its application clear and irresistible in the present case. *Providence Bank* v. *Billings*, (4 *Pet.* 514); *Charles River Bridge* v. *Warren Bridge Co.*, (11 *Pet.* 420).

But admitting that such a grant of the water-power may be implied, another and stronger and more alarming implication — that of an absolute surrender of the public right in perpetuity —

must be made, in order to enable the plaintiffs to maintain their action against an incorporated company, who, according to the principle of *M'Clenachan* v. *Curwin*, (3 *Yeates* 373; 6 *Binn.* 514), are to be regarded as the agents of the Commonwealth for the improvement of the navigation of the Monongahela river. But if the rule were otherwise than as before stated, is such a construction necessary to render the grant available according to its terms? Clearly not; because those terms may be fulfilled by giving to it the effect of a temporary license to obstruct the waters of a navigable river, without being subjected to the penalties of nuisance, but subordinate to the public right at the pleasure of the Legislature, whenever it shall think fit to exercise its sovereign power, and to discharge its public duty of improving the navigation of the river; while under any other construction, the proviso not to impede the navigation would be a nullity. The plaintiffs' dam is an impediment now, if it is to be permitted to arrest or interfere with the projected improvement of the navigation. Would such a construction be reasonable?

The grant is without consideration. The plaintiffs, without any large outlay, have enjoyed the privilege for thirty years, and it has been worth to them, according to their own showing, about $500 a year. It is confessedly a privilege of great value. If, therefore, the Legislature had intended to part with it for ever, is it reasonable to suppose that they would have parted with it for nothing, and subjected themselves to the obligation of re-purchasing it again, at some not very distant day, from their own voluntary donee, for the purpose of re-converting the river to its original public destination, at an expense of many thousands of dollars? They never made any distinction, in price, between the lands on the banks of navigable rivers, and any other portion of the public domain, and they have therefore received nothing, either directly or indirectly, in return for this grant. The rule of construction, already referred to, in cases of public grants without consideration, applies here with augmented force, and is entirely consonant with the principles of right reason. Any other rule would work injustice to the donors, and be anything but reasonable.

This view of the case is moreover fortified by the absence of all words of limitation in the grant. There is nothing to indicate any determinate estate in the grantees. The right, if any, is a mere easement, and not an interest. Perhaps it might properly be denominated a franchise or liberty, which is defined to be "a royal privilege or branch of the King's prerogative subsisting in the hands of a subject." At all events, it is but an incorporeal property appurtenant to lands, or annexed to the ownership thereof, which lies only in grant, and not in livery, and one, moreover, which could not even be sustained by a prescription. When the Legislature intend a conveyance of the fee, they never fail to use the appropriate words. The omission in the present instance is

readily accounted for, and is only to be accounted for by the fact that there was no consideration involved, and it was not their design to part with so valuable a property for nothing. That they never intended such a grant, is further evident from the fact that they never in any other instance parted with their right to the water of a navigable river; *Carson* v. *Blazer; Shrunk* v. *Schuylkill Nav. Co.;* and that in the present case they have provided no indemnity for mill-owners, either upon the Youghiogeny or Monongahela rivers, but have directed them to alter their dams at their own expense, upon the latter stream, under the penalty of an absolute forfeiture of their rights.

But if such a grant as that claimed by the plaintiffs could reasonably be inferred from the Acts of Assembly, under ordinary circumstances, and in violation of the rules already referred to, on the ground of a probable intent on the part of the Legislature to make it, there is another rule of interpretation on this subject, settled by the highest judicial authority in this country, which must be regarded as conclusive against the right claimed by the plaintiffs in this action. The Supreme Court of the United States has more than once decided, that in a grant from a State to a citizen, no surrender of any one attribute of sovereignty which is lodged in the sovereign for the common benefit of the people, shall ever be implied. *Providence Bank* v. *Billings; Charles River Bridge* v. *Warren Bridge Co.* The former case was a question in relation to the taxing power; but in the latter, which was the case of a public highway, the court say distinctly, that they wish it to be understood as applying to all cases wherein the surrender of any power which is vested in, and exercisable by the sovereign for the common good, may be claimed by the citizen; and they put our very case, substantially, by way of illustration. It is worthy of remark, also, that Justice STORY, in dissenting from the opinion of the court in that case, rests his objections on the fact that there was an adequate consideration for the grant, and admits, that if it had been otherwise, the rule would have been indisputable. Under the authority of that case, the right claimed here could have been maintained only on the footing of an express grant of the water-power, and an express contract on the part of the State not to obstruct or impair it by any future improvements in the navigation.

But supposing such a contract to exist, there is another very material question to be answered; and that is, whether it was competent to the Legislature to make it? It is admitted that there are certain rights belonging to the State which may be granted away at the discretion of the Legislature. There are others, however, which are essentially public, which have been enumerated by the feudists among the *res sacræ,* but are better known by the denomination of *jura publica* or *jura communia,* as contradistinguished from the rights of the crown. These, and such

things as are materially related to them, are unalienable. The rule laid down by BRACTON, is, that " things which relate peculiarly to the public good (*et quæ faciunt ipsam coronam, et communem utilitatem respiciunt*) cannot be given, sold or transferred by the King to another person, or separated from the crown." The same rule was admitted by the feudal law. " *Res ad coronam regis, vel utilitatem publicam pertinentes inter sacras numerantur; neque recte in feudum dantur, et quasi sacræ dicuntur.*" *Schultes on Aquatic Rights*, (24 *Law Lib.* 4); *Bracton, liber* 2, *cap.* 5; *Craig Jus. Feud. liber* 1. " The rights, or private prerogatives of the crown, on the other hand, being of a secondary nature, and not necessarily dependent on the public rights, or affecting the common utility of the realm, were allowed to be transferred." (*Ibid.* 5.) " The subject hath in navigable streams an interest of common right, which cannot be abridged, diminished or counteracted even by a royal grant." (*Ibid.* 26.) And again: " The right of property in the soil (of a navigable river) belongs to, and is transferable by the King, though this is subject to the *jus publicum* of the subject when they interfere with each other." (*Ibid.* 41, 42.) " Every public river or stream is *alta regia via.*" (*Ibid.* 50.) Therefore " the right of fishery never was vested in the crown exclusively. As a public right belonging to the people, it *primâ facie* vests in the crown; but such investment does not diminish the right or counteract its operation." (*Ibid.*)

The same distinction is fully recognised by the attorney and solicitor-generals *arguendo* in 2 *Anstruther's R.* 603. They say: " the *primâ facie* right of the crown to all ports and arms of the sea, and to the soil thereof, is clearly established. The nature of that right is explained by Lord HALE, in his *De Jure Maris*, and *De Portibus Maris.* It is there shown (p. 12,) that the King has the soil of the sea-coast and havens, and is entitled to the profits thereof as a *jus privatum;* and, so far as it is considered in that light merely, he may grant it away.. But he has also (pp. 81, 83, 88, 89,) another right in the arms of the sea—the right of free passage for all his subjects and others, and of having all havens and branches of the sea preserved from nuisances for that purpose. This is a right similar to the King's property in a highway—a mere *jus publicum*—vested in the King for the use of the subject. This, by its nature, is unalienable, and shall prevail against any claim set up against it. *Hale de Jure Maris* 12; *De Portibus Maris* 85."

It may be remarked, also, that by the common law, where the navigability of a river is ascertained by the ebb and flow of the tide, even above that point, and in the case of a purely fresh-water stream, where the riparian owners are unquestionably entitled *ad medium filum aquæ*, the *jus publicum* has been uniformly recognised to exist. 3 *Caines* 315, 319; 10 *Johns.* 237; 2 *Conn.* 481. On this point Chancellor KENT says: " the common law, while it

acknowledged and protected the right of the owners of the adjacent land to the soil and water of the river, rendered that right subordinate to the public convenience; and all erections and impediments made by the owners to the free use of the river as a highway for boats and rafts, are deemed nuisances." 3 *Côm.* 411. It would be strange indeed if the public interests were not as well protected in this country. That the people at large are themselves the sovereigns, is no sufficient answer to their just claims in this respect. It is not admitted that there are no restraints upon the law-making power, except such as are to be found in our several constitutions; and if a royal grant be void in England, because it is against common right, there is no reason why the same protection should not be extended to us here against the usurpations of our own temporary representatives. The right to the soil and water of a navigable river is vested in the Commonwealth merely as the representative of the people, of whose interests they are the guardians. It is, however, but a trust for the common use, and any appropriation of it to an individual for his own private emolument, would be such a misapplication of the trust estate as would enable the real owner (the public) to follow it into the hands of the fraudulent grantee.

The Supreme Court of this State has in fact affirmed the sacredness of the *jus publicum* even in the case of a small incorporated town. In *Barter* v. *The Commonwealth,* (3 *P. R.* 253), where an individual claimed a right to use a well of long standing upon a public street, it was decided that the government of every town has an indisputable right to improve the streets for public purposes; that the title of the corporation to the soil for such purposes is paramount and exclusive; and that no private occupancy, even by permission, can vest a title inconsistent therewith. Such occupancy is always subordinate to the public franchise. If this be law as to a petty municipal corporation, how much more appropriate to the sovereign power, the State itself, in the case of a navigable public river! It is urged, however, that the charter of the defendants, and the authority to collect tolls from those navigating the river, would be itself, under this doctrine, such an abridgement of the public right, as would avoid their own grant. The reply is obvious. The grant of the defendants is of a privilege entirely consistent with, and in furtherance of the public user of the stream; and *M'Clenachan* v. *Curwin* decides that the exaction of a toll is no abridgement of the public right, but merely a reasonable tax levied by the government to defray the expenses of an improvement made for the common benefit of the citizens.

But suppose the plaintiff's right to be established; the next inquiry will be, whether they can maintain this action? The action is in case for a nuisance occasioned by the construction of the defendants' dam. It is not pretended that the defendants have exceeded their authority, that they have been guilty of negligence

in the execution of their work, or that they have wantonly injured the plaintiffs. How, then, can this action be maintained? The defendants are not certainly suable in tort for doing what the law expressly allows, unless they have done it so negligently or unskilfully as unnecessarily to damnify the plaintiffs. It was even questionable for a long time whether an action in tort would lie against a corporation at all. It has been decided, however, in this State, that it may be maintained against them, provided it be averred and proved that they have exercised their powers wrongfully and injuriously to the plaintiff. (4 *Serg. & Rawle* 6.) If the defendants had pleaded specially their license, there could have been but one reply; and that would be, that the Act under which they justified was unconstitutional. If, however, the Law was unconstitutional, and the defendants were acting without authority, they were liable individually. To bring an action against them as a corporation, and at the same time to charge them with a nuisance for acting without warrant, would be to affirm their charter and deny their authority in the same breath. This view of the case is very strongly enforced in the *Law Magazine for April* 1843, No. 1— article, "*Consequential damages.*" If, on the other hand, the law was constitutional, it would undoubtedly furnish a complete justification to the defendants. This principle is settled in 4 *T. R.* 790; *Callender* v. *Marsh*, (1 *Pick.* 418).

But is the law unconstitutional? If it be so, it must be on the ground, either that it impairs the obligation of a contract, or that it takes private property for public use without making compensation to the owner. But there is no contract in the case. There is no grant of the water-power, and no agreement on the part of the State not to make an improvement in the navigation which might have the effect of neutralizing that power; and if there had been, it was without consideration, and therefore void. If, however, there be a contract, the law incorporating the defendants does not act directly upon the subject of the grant itself, and does not therefore impair its obligation. 3 *Pet.* 289; 2 *Pet.* 380. An Act of a State Legislature may, under this limitation, devest vested rights, without interfering with the constitutional interdict; and if any injury is done, it is for them to furnish the remedy. *Ibid.*

Does it then "take private property" for public use? It does not certainly "take" either the dam or the mill of the plaintiffs. If they have a right to the former, it is not even disturbed. There is no direct invasion—no "taking" of property, at all events— within the meaning of the Constitution. The damage, if any, is merely incidental or consequential; it is only *damnum absque injuria*; and for this, however much they may be injured, they cannot maintain their action. 6 *Whart.* 45. Chief Justice Gibson, in delivering the opinion of the court in this case, says that "the constitutional prohibition extends not to matters of mere annoyance." "The injury complained of is not direct, but conse-

[Monongahela Navigation Company v. Coons.]

quential." But though the State usually compensated consequential damage, it was of favour, and not of right. Nor did she always make such compensation. In one well-known instance, she destroyed a ferry by cutting off access to the shore, without provision for the sufferer; and in *The Commonwealth* v. *Richter*, (1 *P. R.* 467), damages were unavailingly claimed from her for flooding a spring by a dam. The word " taking," in the Constitution, is interpreted to mean taking the property altogether—not a consequential injury to it, which is no taking at all. For compensation for the latter, the citizen must depend on the forecast and justice of the Legislature." This opinion seems to be conclusive on the point. If a ferry may be cut off without compensation, (and it has been decided that a fording may, *Zimmerman* v. *Union Canal Co.*, 1 *Watts & Serg.* 346), there is no conceivable reason why the same rule should not extend to the case of a dam.

The like doctrine has been settled by the highest authority in Massachusetts, Connecticut and New York. In the first, it has been held that an action would not lie against the surveyor of the highways for digging down or filling up a public street, whereby the property of an individual was injured, (*Callender* v. *Marsh*) ; and the same point is said to have been lately ruled in this county by the judge before whom the cause was tried, in the case of the Hand Street Bridge Co. of Pittsburgh. In Connecticut and New York, it has been decided that the proprietors of lands on the banks of a navigable river were not entitled to recover in a suit against either an incorporated company, or a State officer authorized to improve the navigation ; although, in the former case, the lands of an individual were gradually undermined and washed away, and in the latter a valuable wharf was destroyed by rendering it inaccessible to shipping. These, too, were moreover cases of undoubted private ownership, founded upon valuable consideration ; but the court held in both that the proprietors of lands in such situations took them subject to such contingencies : that the injury done was not such a " taking" as is provided for in the Constitution ; and that, as the defendants acted within their authority, no action could be maintained against them. 9 *Conn.* 436 ; 4 *Cow.* 146.

But there is yet another consideration which is entitled to great weight. If the Act of Assembly under which the defendants have acted be (as it undoubtedly is) constitutional, and the plaintiffs are notwithstanding entitled to recover in this suit, the defendants will be liable to be harassed by repeated actions of the same kind, and are entirely without remedy, because there is no mode pointed out in the Act by which the estate of the plaintiffs can be devested. There would seem to be no good reason either, in that case, why an assize of nuisance might not be brought (and the action on the case may be made to answer the same purpose in effect) to abate

[Monongahela Navigation Company v. Coons.]

the defendants' dam altogether, although constructed under the admitted and unquestionable authority of the Legislature!

*2d Point.* But, admitting the right of the plaintiffs generally to maintain their action for such an obstruction as that complained of, it is further contended that, if their mill and dam were below the high-water mark on the Youghiogheny river, they are not entitled to damage for swelling the water merely up to that point. The proof in the case was, that their mill could not run in high water even before our erection. This position is founded on the common law principle that the right of soil of owners of lands bounded by a navigable river, extends only to high-water mark. 6 *Mass.* 435; 6 *Cow.* 578; 1 *Halsted* 1. In further support of this principle as applicable to fresh-water rivers in this State, it is only necessary to refer to one or two cases decided in our own courts. In *Commonwealth* v. *Fisher*, (1 *P. R.* 467), compensation was denied to the owner, in the case of a spring between the high and low-water marks on the Susquehanna, which was overflowed by one of the State's dams. HUSTON, J., in delivering the opinion of the court, remarked, that all below high-water mark on navigable rivers was public property, and that the State never sold lands below that point. The same doctrine was afterwards recognised in the case of *Zimmerman* v. *Union Canal Co.*, and in *Ueberoth* v. *The Lehigh Navigation Co.*

*3d Point.* But, supposing the crest or upper surface of the defendants' dam to be so far below the level of the plaintiffs' wheel as to create no obstruction, except when the water is above the ordinary stage and running considerably over their dam; are the defendants responsible in that case? It has been already decided in this State that the proprietor of lands on a private water-course is entitled to the fall of the stream in its natural state, as it passes through his lands. It would seem, therefore, to follow, as a matter of course, that he is entitled to back the water in that state up to his own line. If, however, in consequence of a flood, it should be so swollen as to throw it upon his neighbour, he is certainly not responsible for any injury which might be occasioned thereby. It is, at the worst, merely incidental or consequential, (HUSTON, J. in *Alexander* v. *Kerr*, 2 *Rawle* 91); and, being superinduced by the act of Providence, is not remediable at law. 4 *Rawle* 23.

*4th* and *5th Points.* But the plaintiffs were bound to show their compliance with the terms and provisoes of the Act under which they claimed, and that they were moreover the owners of the adjoining lands. That they were so bound, is obvious from the consideration that their dam is against common right, and is, *primâ facie*, a nuisance; and their title is made expressly to depend on the condition that they do not impede the navigation, and that they also construct and keep open a convenient passage for boats, &c. It is a part of their title, therefore, and ought to be duly set forth and proved. 2 *Stark. Ev.* 912; 6 *B. & C.* 317. So too with

[Monongahela Navigation Company v. Coons.]

regard to the ownership of the adjoining lands. The right, if any, is annexed to the ownership, and cannot subsist elsewhere. They have, however, set out merely a possession, and, in virtue thereof, a title to the use of the running water. But possession, even for 21 years, would clearly make no title as against the public; and, *primâ facie*, the title is still in the latter. If the plaintiffs are entitled, it is by virtue of an agreement or license, and not in consequence of any possession of, or even ownership in the adjoining lands; and the averment by reason of the possession, is therefore improper. 2 *Saund. Plead. & Ev.* 687; 4 *East* 107; 6 *East* 438. Here the declaration avers merely a common law right in respect of the possession of lands, to the running waters of a navigable stream. This, however, cannot be. It is therefore the case of a defective title, and not of a good title defectively set out; and the plaintiffs cannot, upon their own showing, recover.

*Miller*, for the defendants in error, cited 3 *Watts & Serg.* 540; 8 *Cow.* 145; 4 *Wend.* 9; 9 *Watts* 228.

The opinion of the Court was delivered by

GIBSON, C. J.—The question for decision depends on considerations that did not enter into the case of *The Union Canal Co.* v. *Landis*, (9 *Watts* 228). In that case, the grant to the individual contained a reservation in favour of the company to whom a prior right had been granted, which put at rest every pretence of claim to damages for acts subsequently done to the prejudice of the second grantee. The reservation was perhaps superfluous; but it seems to have been thought a judicious precaution, because a license followed by a permanent erection for the enjoyment of it is generally irrevocable; and it might have been deemed a contract, in that instance, which the State could not impair. But what grant is there in the statute of 1803 to require a reservation? That statute gave riparian owners liberty to erect dams of a particular structure on navigable streams, without being indictable for a nuisance; and their exercise of it was consequently to be attended with expenditure of money and labour. But was this liberty to be perpetual, and for ever to tie up the power of the State? or is not the contrary to be inferred from the nature of the license? The object was not to give a new and an irrevocable right; but to restore the qualified use of an old one, so long as it should consist with the public good, by remitting the owner of the soil to the situation in which he stood before the stream was made a highway; and the statute did no more than operate a partial repeal of the Act which had declared it to be so. It reconciled a modified enjoyment of the owner's ancient right, to the present enjoyment of the public right of navigation and fishery. Hence it provided that the owner of land on the shore of a navigable river, declared by law to be a highway, might erect a dam on it,

[Monongahela Navigation Company v. Coons.]

if it were so constructed as not to " obstruct or impede the navigation, or prevent the fish from passing up the same." Is there anything like the offer of a bargain in that ? So far was the Legislature from seeming to abate one jot of the State's control, that it barely agreed not to prefer an indictment for a nuisance, except on the report of viewers, to the Quarter Sessions. But the repeal of a penalty is not a charter ; and the alleged grant was no more than a mitigation of the penal law. It barely placed the owner of the soil in a position almost as favourable as that in which the declarative law had found him ; and if that position were to secure him from disturbance by any further measure of public improvement, the State would be incompetent to declare any river a highway on which there happened to be a mill-dam.· The statute is *pro tanto* a repealing one, which offers no express compact to any one ; and such a compact is never to be implied. It was ruled in *The Charles River Bridge* v. *The Warren Bridge,* (11 *Peters* 420), that the State is not presumed to have surrendered a public franchise, in the absence of proof of an unequivocal intention to do so. It would seem that the public dominion may be parted with, but not without an explicit renunciation of it. And this relieves the case from the pressure of that clause in the Constitution which declares that no State shall pass a law impairing the obligation of contracts.

It is contended, however, not so much that the power of the Legislature falls short of a case like the present, as that it can be exerted only on the basis of compensation made or secured ; and that for damage done by the authority of the State, there is, in every case without it, redress by action : in other words, that the authority is void. We must not forget, however, that the State is a sovereign who cannot be sued against her consent; and that there are no other limitations to her power over private property than those that are placed upon it by the Constitution. What are they ? " No person shall, for the same offence, be twice put in jeopardy of life or limb ; nor shall any man's property be *taken* or *applied* to public use without the consent of his representatives, and without just compensation being given." Again : " In all criminal prosecutions, the accused hath a right to be heard by himself and his counsel ; to demand the nature and cause of the accusation against him ; to meet the witnesses face to face ; to have compulsory process for obtaining witnesses in his favour ; and, in prosecutions by indictment or information, a speedy trial by an impartial jury of the vicinage : he cannot be compelled to give evidence against himself; nor can he be *deprived* of his life, liberty or *property*, unless by the judgment of his peers, or the law of the land." Now, it cannot be said that the plaintiff's mill was taken or applied, in any legitimate sense, by the State, or by the company invested with its power ; nor can it be said that he was deprived of it. In the case of *The Philadelphia and Trenton Rail-*

VI. — 15                     K *

[Monongahela Navigation Company v. Coons.]

*road*, (6 *Whart.* 25), the words in the first paragraph were allowed to have their obvious and popular meaning, so as to be restrained to property taken away, and not extended to property injured by an act which did not amount to an assumption of the possession; and the same rule of interpretation would give the same meaning to the word "deprived," in the second. It is true, that a nuisance by flooding a man's land was originally considered so far a species of ouster, that he might have had remedy for it by assize of novel disseisin, or assize of nuisance, at his election; but we are not to suppose that the framers of the Constitution meant to entangle their meaning in the mazes of the *jus antiquum*. It was aptly said by Chief Justice TILGHMAN, in *The Farmers' and Mechanics' Bank* v. *Smith,* (3 *Serg. & Rawle* 69), that conventions to regulate the conduct of nations are not to be interpreted like articles of agreement at the common law; and that where multitudes are to be affected by the construction of an instrument, great regard should be paid to the spirit and intention. And the reason for it is an obvious one. A constitution is made, not particularly for the inspection of lawyers, but for the inspection of the million, that they may read and discern in it their rights and their duties; and it is consequently expressed in the terms that are most familiar to them. Words, therefore, which do not of themselves denote that they are used in a technical sense, are to have their plain, popular, obvious, and natural meaning; and, applying this rule to the context of the Constitution, we have no difficulty in saying that the State is not bound beyond her will to pay for property which she has not taken to herself for the public use.

If, then, the State would not be bound to pay for the damage done to the plaintiffs' mill, had she been the immediate cause of it, how is the defendant bound? The company acted by her authority, as well as for the public benefit; and consequently with no greater responsibility than is imposed by the Constitution, which, it must be admitted, has narrowed the protection that the delegation of her power would otherwise have afforded. "The Legislature," it is said in the tenth article and fourth section, "shall not invest any corporate body or individual with the privilege of taking private property for public use, without requiring such corporation or individual to make compensation to the owner of such property, or give adequate security therefor *before* such property shall be taken." A corporation, then, must pay or secure the price of the property before it is taken; but the State must provide the means of payment at the passing of the Act. The difference is less in reality than appearance; and, in every other respect, the delegation of a valid authority protects the agents of the State as amply as it protects the State herself. Still, it is only to a case of taking that the obligation extends; and when a corporation acts by virtue of a constitutional law, it is subject to no other responsibility for acts of consequential damage, than is spe-

cially provided for. But there is no provision for consequential damage in the statute by which the defendant has been incorporated. The eighth section provides for damage to the shores; and the sixteenth, which authorized the owners of private dams to make them part of the public works, has been repealed without giving them the same compensation for damages to their mills, as suggested by the company, that is given to the owners of the shores for damage to the soil. . But the suggested provision would scarce have reached the case before us; for the plaintiffs' mill is seated, not on the Monongahela, which is the river that was in legislative view, but on the Youghiogeny, several miles above its confluence. Moreover, the compensation could have been had only by an award of freeholders, appointed by the parties or a justice of the peace, pursuant to the act of incorporation, and not by an action at the common law. If, then, the statute is constitutional, as it undoubtedly is, there is an end of the question; for a valid law necessarily affords a defence for acts commanded or authorized by it.

It is not, therefore, enough to set before us a case of moral wrong, without showing us that we have legal power to redress it. Beyond constitutional restraint or legislative power, there is none but the legislative will, tempered by its sense of justice, which has happily been sufficient, in most cases, to protect the citizen. Compensation has been provided for every injury which could be foreseen, whether within the constitutional injunction or not, in all laws for public works by the State or a corporation; though cases of damage have occurred which could neither be anticipated nor brought within the benefit of the provision by the most strained construction. In one instance, a profitable ferry on the Susquehanna, at its confluence with the Juniata, was destroyed by the Pennsylvania canal; and, in another, an invaluable spring of water, at the margin of the river, near Selinsgrove, was drowned. These losses, like casualties in the prosecution of every public work, are accidental, but unavoidable; and they are but samples of a multitude of others; so that the plaintiffs have at least the miserable good luck to know that they have companions in misfortune: would that it were in our power to afford them more solid consolation!

HUSTON, J., *dissentiente.*—As I cannot, after the most deliberate consideration, concur in the opinion of the majority of the court, I shall state my reasons.

The Youghiogeny was declared a highway on the 13th April 1782. It is not so long a stream as Pine Creek or Toby Creek, and perhaps does not pass, in a year, so much water as either of those streams, or as French Creek, or Bald Eagle, or Fishing Creek, in Columbia county, or some other streams, called creeks, in this State. It is, therefore, within the letter and spirit of the

[Monongahela Navigation Company v. Coons.]

Act of 23d March 1803, which permits persons holding lands on any navigable stream declared by law a highway, to erect a dam for a mill or other water-works on the same stream, adjoining his own lands, and to keep the same in good repair, and to lead off the water, &c., with a proviso as to obstructing the navigation, and a proviso that the person so erecting said dam shall not infringe upon or injure the rights or privileges of any owner or possessor of any private property on such stream. Before this stream was declared a public highway, the right of the riparian owner was the same as it became by this law, except that the law restricted the height and slope of the dam.

I understand the opinion of the court as admitting (what could not be denied) that a license, which could not be enjoyed without, and which was followed by the expenditure of money and labour, is irrevocable. In this case it was followed by a dam across the stream about two feet high, but so constructed as not to injure the navigation, and a large stone mill, two stories high—and to erect these cost much labour and expense. It restored the owner of this mill to the same right as before the Act of 1782, except as to the height and shape of the dam. His dam was no longer a nuisance, and no person could remove or injure it with impunity. 3 *Serg. & Rawle* 273; *Criswell* v. *Clugh*, (3 *Watts* 330). The State, after a mill had been erected under this law, had the same right as it had in all other cases, viz. to take the water of this stream or to overflow this mill, in improving the navigation of that stream, or any other navigation, upon *payment for the damage*, and it had no other right, and could give no other right.

There is sometimes a little confusion as to what is a contract. There is as much contract as to this dam and mill, as to the land adjoining, or to any house or barn or land in this State; and rather more, for there is an express legislative permission to make the dam and build the mill. I do not contend that the operation of the Act of 1803 ties up the State from making public improvements, but it puts the dam and mill under the *protection of* the law, and they cannot be taken or destroyed without compensation.

I shall not cite authorities to prove that a man specially injured shall in all cases have remedy by action. It was at one time doubted whether actions of trespass or case lay against a corporation. It has been long settled that a corporation is as liable and suable as an individual. In *Turnpike Co.* v. *Rutter*, (4 *Serg. & Rawle* 6); and *Riddle* v. *Merrimack Canal*, (7 *Mass.* 169), this point was very fully argued and considered. But I have higher authority. By the Constitution of this State, art. 9, § 10, no man's property shall be taken or applied to public use without the consent of his representatives, and without just compensation being made. § 11: That all courts shall be open, and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice adminis-

[Monongahela Navigation Company v. Coons.]

tered without sale, denial or delay; and in article 7, § 4, the Legislature shall not invest any corporate body or individual with the privilege of taking private property for public use, without requiring such corporation or individual to make compensation to the owner of said property, or give adequate security therefor, before such property shall be taken.

It is remarkable that neither the plaintiff nor the defendant read these clauses of the Constitution. The assertion that property could not be taken was made; but the 11th section, giving the right to sue and obtain redress, was never mentioned, nor, as I recollect, alluded to; and, in my opinion, it is most material and compulsory on the court to grant redress. I have more than once expressed my opinion as to the frequent resort to constitutional question, where there is no such question in the case. There is, and must be, an unlimited power, on certain subjects, in every government; and it is often right, and often practised by the Legislature, to act on this principle. The use of a written Constitution is to fix limits to this otherwise absolute power; and in this sense peculiarly it is the supreme law of the land. Whatever is absolutely prohibited or positively enjoined cannot be altered until the Constitution is changed by the people, or by a revolution. The last words of the Constitution are : "To guard against transgressions of the high powers we have delegated, we declare that everything in this article is excepted out of the general powers of Government, and shall for ever remain inviolate." Now the prohibition to take or apply private property without compensation, and the command to the courts to give redress, are both in that article, and the act of a Legislature which should so take or apply it, or of a court which should refuse redress, would each be contrary to the letter and spirit of that instrument.

But an opinion, not called for in that case, given, too, after all that was material had been rightly and clearly decided, has been cited in this case. 6 *Wharton* 45, 6. The court had rightly decided that the street of an incorporated town or city was a public highway, (so much so, by-the-bye, that the Quarter Sessions cannot vacate it as they can common highway), and that no one person had more right to it, as a highway, than every other person had. Instead of stopping here, it went on to say that taking, meant taking away altogether. 5 *Conn.* 166; 6 *Cow.* 525. Now where no person has an exclusive right to a way, he cannot be deprived of any individual right, so long as it is an open highway; and whether it is changed to a turnpike or macadamized road or a railroad, it is still a highway; belongs to the public, and may be improved, altered, &c. by the Legislature. No individual has any private right in it, and none can be taken from him.

But Clark's Ferry and Richter's Spring have been mentioned. The Susquehanna was a public highway before any right in Clark; he purchased both shores, and had a ferry. The northern road to

[Monongahela Navigation Company v. Coons.]

Pittsburgh and the road up the Susquehanna crossed at his ferry. Long before any canal, the Northern Turnpike kept above the mouth of the Juniata, and the ferry was moved to suit the travelling. Soon after, a bridge was erected over the Susquehanna, just below the ferry, and everybody crossed on the bridge, and the ferry was abandoned. The same thing happened at Harrisburg, where two ferries, one below and the other above the island, were abandoned, though no canal was near them, and at Sunbury, and Derr's Town, and Dansville, &c. As to Richter's Spring, the injury to it was only a figurative one in the counsel, and the court (opinion by myself) did not know that the canal was on the island, and the spring was near the main shore, with a branch of the river between it and the island, and no dam below to throw the water back on it, nearer than the mouth of the Juniata, about thirty miles below it.

Judgment reversed.