*Kunkel,* for defendant.

---

*Court of Common Pleas, Dauphin County, May* 13th, 1854.

### PATTEN *v.* THE SUSQUEHANNA RAILROAD COMPANY.

The court has power to set aside the report of viewers to assess the damages caused by the building of a railroad, when the sum allowed was exorbitant; but this error must be clearly made out. The State has the right to take the property of individuals, or may commit to others that power, but they must make compensation for the property so taken. In assessing the damages caused by the building of a railroad, the inquest is only to take into consideration those that will result from the ordinary use of the road, not those arising from unskilfulness, carelessness, or wantonness on the part of the company or its agents. A juror upon an inquest may be examined to show the grounds upon which they made their report; all the jurors need not be called. Parol testimony may be received to explain a report of viewers. In assessing damages, the jurors should not consider probable future legislation. Viewers may be appointed to assess damages before the actual building of a railroad, as soon as any entrance is made, or damage, however slight, is done to a person's property. A man seized of real estate in right of his wife is not a freeholder, and cannot be a viewer to assess damages caused by the building of a railroad; this objection should be made before the viewers reported, if known at that time.

BY THE COURT.—Although numerous exceptions have been filed to the report of the inquest in the present case, only five have been relied on in the argument. We shall treat of these in the order in which they arise.

1st. Complaint is made that the sum awarded is excessive, and exceeds the amount of damages sustained, or likely to be sustained from the construction and use of the road. We are told in reply

that this court has no authority to set aside the award on that account. It must be conceded, that some of the decisions seem to countenance the idea that no such power is by law vested in the courts, and that the question is exclusively for the jury, without control. We consider that the weight of authority is to the contrary, particularly Railroad Company *v.* Hiester et al. (8 Barr, 445); where all the prior decisions are reviewed. Why require the confirmation of the court, if it has no power to reverse the action of the viewers? The language of the act is, "If any damage be awarded, and *the report be confirmed by the said court,* judgment shall be entered thereon." This was certainly not intended as a mere form, but is a matter of grave substance; and the court has the power, and it is its imperative duty, to refuse confirmation in every case where the viewers have decided illegally, acted on improper principles, or committed a clear mistake, by allowing too much or too little damages. To justify the court in setting aside a report on account of an error in the amount of damages, the case must be clearly made out. The inquest has had the advantage of a view, which the court has not, and is the tribunal fixed by law to ascertain the damages. It must, therefore, be a clear case to justify the intervention of the court. We have no evidence here of such gross error as would, on account of the amount of damages *alone,* authorize us to refuse confirmation. From the form of the report it is difficult to ascertain from what data the award was made out; but the evidence of one of the viewers shows, that they gave for one acre one hundred and fifty-two perches the sum of $2550. If the value of the property was not enhanced by the railroad, this appears to be a most extraordinary price to fix on land, embracing no buildings of any kind; and if it derives its value from that source, nothing whatever should have been given, as the residue retained by the petitioner must have been increased in equal proportion. We have no evidence before us of the previous value of this property, except the assessment, in which the whole fifty acres, including all the buildings, is valued at $12,000. The true question for the viewers in every case is, What was the property worth before the railroad was projected or contemplated, and what is it worth now? The sum of $1500 is allowed for removing a bark shed, or rendering it fire-proof, and $4125 for the risk to the tannery from fire. The inquest received evidence to show that the additional charge for insurance of $16,000 on the establishment would be 1½ per cent., on account of the increased risk, and computed the amount of interest on a sum of money sufficient to pay for, and keep up that insurance, without making any allowance in the computation for the return of the money in case of loss by fire, and payment of the insurance; whereas, in such an event, the payment of the annual premium would cease. In that case the money should have been refunded

to the railroad company, and as the viewers probably could not have so awarded, a smaller sum should have been taken as the data.    In that part of the report there is manifest error.

2d.  It is complained that the viewers allowed for the probable injury to the property from the *carelessness, negligence,* and *wilfulness* of the railroad company and its employees, in conducting their business thereon.    This is an important question to both parties.  If a railroad company is to be exonerated from all future liability for damages done on the premises of an individual, through the negligence, unskilfulness, or wilfulness of its agents and employees, it is well calculated to enhance the damages, and might, in the opinion of the viewers, make them responsible for a much larger sum in the assessment than would be charged for the bare use of the road, with the risks necessarily attendant on the mode of user by locomotives, where reasonable care and skill were exercised, accompanied with the best appliances and machinery to guard against fires.  The knowledge that no future *liability exists* is well calculated to produce carelessness and recklessness.  If the company is not to pay for it, the risk to property is greatly increased, and a corresponding allowance should be made by the viewers.    If the law is otherwise, it should be so understood when the damages are assessed.    The commonwealth has the entire control of the property of every citizen, and must judge of the propriety and necessity of taking it for public use; the only constitutional security is that an equivalent shall be paid. The State, through its legislative councils, must judge when it is for the interest of the whole community to commit the improvement of the country to the care of others, and can confide to such others the same right of taking the property of the citizen for the public good that is vested in it by the Constitution, taking care to secure just compensation therefor; and in the case of corporations, requiring the compensation to be made, or adequate security given, before the property be taken.    It is clearly settled in Pennsylvania, by a series of cases too numerous and well considered to be now shaken, that a company, to which is confided the construction of a public work, is not responsible for consequential damages further than is provided for in the act of incorporation.  6 Barr, 379 ;  8 W. & S. 85 ;  6 W. & S. 101. A distinction is clearly established, under the Constitution, between *taking* property and the mere *user*, or putting the holder to inconvenience. 4 H. 192 ;  6 Wh. 25 ;  6 W. & S. 101.    The law incorporating this company refers to the general act of Assembly for the assessment of railroad damages ; by which it is provided that the viewers shall estimate the quantity, quality, and value of the lands taken away ; and shall consider all the advantages and disadvantages which have resulted, or which may seem likely to result, to the owner of the land from the making and opening of the road, and

[Patten v. The Susquehanna Railroad Company.]

allow him his damages, if any. It has been already decided that, under an act worded substantially like the present, the viewers must take into consideration the damages or inconvenience likely to result to the owner of the land from the use of locomotives on the road and consequent danger of fire from sparks, and that it will be presumed that they have made an allowance for such risk. There is no doubt that such is their duty in the present case. It is contended that they have gone farther, and allowed damages for all possible injury, whether arising from the ordinary and proper use of the railroad by locomotive engines, or carelessness, negligence, want of skill, or wilfulness, on the part of the company or its agents. The position is assumed by the petitioner's counsel, that if such allowance was made, it was right and proper except as to wilfulness; and to sustain that principle they have referred to the Railroad Company v. Yeizer, 8 Barr, 366; Mifflin et al. v. The Railroad Company, 4 H. 182; Railroad Company v. Skinner, 7 H. 298. After the most attentive consideration of all these cases, we are of the opinion that they contain no such principle. The first-named case decides no more than is conceded by the present company,—that it is responsible for the damage likely to result from the ordinary use of the road; and Judge Rogers says in terms: "That the company is not to be mulcted in damages, *unless on proof of negligence* on its own part or that of its officers." The assessment by the viewers was not held in that case to cover more than the damages from the ordinary use of the road; and the plaintiff was defeated in his action, not because he had already received compensation for his injuries arising from negligence, but because there was no proof whatever of any carelessness on the part of the defendant or its agents. The point does not arise in 4 Harris; and in the case in 7 Harris, Judge Gibson declares that the irresponsibility of a railway company *for all but negligence or wanton injury* is a necessity of its creation. It is true that this court said in Forster v. The Bridge Company: "that after the assessment of damages, the company is not answerable for any further injury even when caused by negligence." But this was stated in the hurry of a jury trial, and was supposed to follow the case of The Railroad Company v. Yeizer; it was not the point of the case, and was entirely unimportant. The opinion I unhesitatingly retract, as not founded on authority or any sound legal principle. Negligence, carelessness, want of skill or wantonness are neither to be presumed nor anticipated, and therefore should not be taken into consideration by viewers in assessing the damages done by a railroad to the freehold. If it formed any part of the assessment in the present case, it is an error fatal to the report. The inquest have not stated for what the damages were assessed, except that it " includes future probable damages by fire from locomotive engines," and leaves the ques-

[Patten *v.* The Susquehanna Railroad Company.]

tion of carelessness, or the absence of it unexplained. To show what was included, the deposition of one of the viewers has been read ; which proves that the petitioners contended that the viewers should take into consideration all future injury to the property from carelessness or otherwise ; and that they did so understand the law, and considered that after the damages were paid, nothing more could be recovered. He states most distinctly that " the risk which we took into consideration was without distinction between negligence and other causes." That they did not include a *wilful, designed, and malicious* burning of the property by the use of locomotives, " but allowed damages for carelessness and negligence." Under this evidence, as we understand it, the viewers did not include that kind of damages for which the man committing the act might be indicted for arson or malicious mischief, but every act arising from carelessness, however gross. If such were the rule of law, the damages ought to be greatly increased above ordinary cases. The party using the road, knowing that in no event could there be any responsibility, would naturally become utterly reckless, and the damage would consequently be greatly increased ; an interpretation of the statute which would be fraught with injury and danger to society. If this viewer's evidence is correct, and there is nothing to contradict it, the jury acted on erroneous principles, and allowed for damages for which the company will be hereafter responsible notwithstanding the finding, should the event occur, which would be manifestly unjust. From the sum awarded we have no doubt that the viewers did act on the principles stated, as it is the doctrine now contended for by the counsel. It has, however, been assumed that the court cannot look into this deposition. 1st. Because the witness is a juror and incapable of impeaching his verdict. 2d. That no depositions can be received according to adjudicated cases. 3d. Because only one viewer was examined, and the others may have acted on different principles. There is no rule better settled than that a juror is not competent to prove his own misconduct. 4 Binn. 150 ; 5 R. 61. But he has been permitted to prove that another juror told him that the plaintiff had satisfactorily explained an item of his account. 7 S. & R. 458. He may prove that they did not read papers handed to them, 5 Pick. 296, or that a mistake was made in entering their verdict. 15 John. 309. He may be examined to show the principle on which they found. 5 Cowen, 106 ; 6 N. H. 356. These were cases tried in court, where the jury acted under legal instructions. It is certainly more important, where they have to determine both the law and the facts, that the court should be informed of the principles on which they acted, and what was included or rejected. Hence the members of a sheriff's inquest are frequently examined to show what claims were laid before them, or how they determined the value of property. Ar-

bitrators have often been examined with the view of setting aside or sustaining their award; and in a recent case an arbitrator was permitted and required to prove the grounds on which he acted, and what transpired on the trial. 9 Barr, 254. This view more nearly resembles the action of a board of arbitrators or road viewers, than that of a jury. It has certainly been customary to examine road viewers and viewers of damages in road cases. In The Railroad Company v. Hiester (9 Barr, 451), 5 Wh. 485, and other cases, some of the viewers were examined. A notary public was *permitted* to contradict his certificate, 10 S. & R. 377; and required to do it, 12 S. & R. 284. Therefore we are not aware of any principle or authority, which would require us, in a case like the present, to exclude the only source of correct information. And although it may be considered contrary to legal policy to permit a juror to prove his own misconduct, yet here nothing of that kind is alleged; it is only said that the viewers mistook the law, which is frequently done by the courts, both inferior and superior. 1st. The Supreme Court refused to look into depositions to ascertain the facts. 5 Wh. 482. But they did not say in that or in any other case that we are aware of, that the court, which is required by law to examine into the merits of a report, and confirm or set it aside, could not do so. Should that be decided, the confirmation of reports will be an idle form. The Supreme Court refused to look into the evidence given before the viewers, because it was no part of the record, and had been improperly attached thereto, 7 H. 363; nor would we consider it, unless for the mere purpose of seeing whether illegal evidence had been received to influence the viewers, which would more properly be established by proving *aliunde* what they had received. 2d. We do not consider that the railroad company is required to call all of the viewers to prove the principle on which they acted. Where a matter of that kind is publicly discussed and concurred in generally, any one may prove it; if the petitioner is dissatisfied with the evidence, he can produce the other viewers. We had some doubt as to whether parol evidence could be received to explain the report; but as that exception was not taken, it is unnecessary to decide it. On consideration, we think there is no difficulty on that score, as it does not contradict it; and the present application is unlike an attempt to set it aside in another proceeding. The question goes directly to its validity before confirmation. 3d. It is further objected that the inquest made an allowance for fencing and keeping up the fences, when the company may be called upon hereafter to construct fences along the whole line. That it is sufficiently answered that there is nothing in the present law requiring it, and the viewers have no right to anticipate future legislation. We have no evidence that such an item was included; but if it were it was very proper, and should have

been entered in the report, which ought to be drawn up in a more full and formal manner, to show at an after time what it embraced. Where an allowance is made for fencing it should be so stated, that the company might at all times require the owner of the property to keep up the fences, if useful for its convenience, or in case of future laws requiring it to do so. 4th. The road was not constructed when the damages were assessed. From the evidence, it appears that at the time the petition was presented and view made, the railroad had been located by the engineers, and probably the fences removed to the contemplated line of the road. No grading was done. There was a portion of railroad laid from the abutment in the river to the Stony Creek Railway, for the purpose of carrying stone to build the abutment. This was on a portion of the contemplated line of railroad, but formed no part of it, was temporary in its character, and intended, doubtless, to be removed. Many objections exist against having these views to assess damages before the completion of the road through the land of the petitioner. It is almost impossible for ordinary viewers to form a correct opinion as to the extent and nature of the obstruction, when it only exists in imagination. Embankments and excavations, when completed, are frequently much more or less formidable than viewers, unaccustomed to engineering, would suppose. The danger from fire is sometimes found to be illusory or imaginary, at other times very considerable. It not unfrequently happens that after location and before grading, very important changes are made in the route. If as soon as stakes are stuck in by the engineers a view can be had, report made, and the money collected, a change subsequently found necessary, would not authorize the money to be collected back, although the land was entirely avoided; whilst any alteration on to other portions of the premises, however slight, would probably lead to a second view and new assessment. On the other hand, after taking possession of a man's land and doing it very considerable damage, the labor may be so far suspended as to leave the way unfinished for several years. These matters should all be taken into consideration in construing a statute ambiguously expressed. It is the duty of courts to put such a construction upon an act of Assembly, where the words will admit of different meanings, as to do the least injury and greatest amount of good to the public. But little light can be obtained in this case from former decisions, as they were all founded on acts of Assembly differently worded. Section 10 of the general railroad law provides for the entry upon land by the company, through its agents, engineers, and workmen, the surveying and location of the route of a road, constructing the same, fixing the worth, etc.; and authorizes land to be taken for depots and water-stations; security being first given, or payment made before taking possession. Section 11 de-

clares that where the company cannot agree with the owner as to the compensation for damages done, or likely to be done, application may be made for a view, and the viewers are to meet on the " premises where the damages are alleged to be sustained; and the viewers having viewed the premises, shall estimate and determine the quantity, quality, and value of said lands, so taken or occupied, or *to be so taken or occupied*," etc. But for these last words we should declare that the whole scope of these two sections contemplated that the road should be finished through the land of the petitioner, before any damage could be assessed or a view had. They throw a different meaning on the section, and we feel ourselves constrained to say that the owner of land can demand a view as soon as an entry is made on his land, any injury done however slight, and the route of the road surveyed and definitely fixed. This portion of the law we deem impolitic, and it will be found in practice to work badly, as the damages will unavoidably be assessed in a great measure by conjecture. This exception is not sustained. 5th. It is objected that H. W. Hoffman, one of the viewers, was not a freeholder. By section 11 of the general railroad law the court, on application, is required " to appoint seven discreet and disinterested *freeholders* of said county as viewers to assess the damages, etc." It is not for us to conjecture why the legislature required freeholders to be appointed. The act of Assembly is plain and imperative. Hoffman is said by petitioner's counsel to be possessed of a freehold in right of his wife. It seems that Mrs. Hoffman inherited some real and personal property from her mother, who died early in 1853. Hoffman had possession of this estate at the time of his appointment. He is clearly not a tenant by the curtesy, his wife being still alive, is not seized of a life estate in the premises, but is a tenant by the curtesy *initiate*. He was therefore tenant of the fee simple in *right of his wife;* not in his own right. By the common law that estate was rejected for many purposes. Lord Coke says: " That after issue born the husband could do homage, and an avowry could be made on him by the lord of the fee;" but as we understand it, he would do homage in right of his wife. He is seized of a fee simple estate in right of his wife, with a possibility of a life estate in his own right in case he survives her. This is the nature of his estate after issue born, which probably is now unimportant in Pennsylvania for any purpose. It has been held that the husband had no such estate, as could be forfeited for treason, committed after issue born, but during the lifetime of his wife. In that case the act attainting Joseph Galloway declared all of his estates forfeited of which he was possessed, had an interest in, or was entitled to. Yet the Supreme Court said that *he had no estate in the land of his wife.* He had therefore no interest to forfeit until after her death. Pemberton v. Hicks, 1 Binn. 1. Thus it stood prior to the act of 1848, which has made

a most material change in the rights of married women.    During the lifetime of the wife the husband has no control over her property, either to incumber it or subject it to his debts; but the act declares, "it shall be owned, used, and enjoyed by such married woman *as her own separate property.*"   It may admit of a question, whether she may not deprive her husband of his curtesy estate by properly executing a will; but that is unimportant to the present decision, as it is the wife who has the estate *in her own right* during coverture, and not the husband in right of the wife. Judge King says, "that during the lifetime of the wife, the husband has no sort of *present interest in her estate,* nor any future interest other than as a distributee under the intestate law, whose interest in the estate distributable under those laws comes into existence only on the death of the owner, without having made any other disposition of the estate." 1 Parsons, 493.   Therefore Hoffman had no freehold property.  He was not a freeholder at the time of his appointment.    The arrangement made between him and George Reel gives Hoffman no additional interest.    By that writing, dated May 15th, 1853, it appears that some contract was made between Mr. Reel and Mr. Hoffman, by which the former was to take the personal and the latter the real property of their mother-in-law.    But it is there stipulated that the release of the real estate be not executed until a certain debt taken by Reel could be secured.   From this arrangement it would seem that Hoffman gave his wife's personal property to secure an additional interest in her real estate.   Of course on paying for it with her effects the estate became hers.   It is fair to presume that he intended to take the conveyance in her name; but had he taken it in his own, there would have been a resulting trust in favor of the wife, whose personal effects paid for the land.    It is urged that this exception should have been taken before the viewers reported; and most certainly, if known, it must be so done.    But there is not the slightest reason to believe that the company's agents or counsel knew that Hoffman was not a freeholder until after the report.   The appointment is made by the court *ex parte.*,  Neither side knows who are viewers until their names are placed on the record.   The counsel of the company states that on the ground he inquired of Mr. Hoffman if he was a freeholder, and the gentleman said that he was; which he doubtless believed to be correct.  Therefore there is no negligence on the part of the exceptants, who used all the diligence that could be expected to ascertain the fact.   For the reasons given the court refuses to sanction and confirm the report in this case, but directs that the same be set aside.

*McCormick and Fisher, for plaintiff.*

*Kunkel, for defendant.*