## Case No. 12,139.

RUNDLE v. DELAWARE & R. CANAL.[1]

[1 Wall. Jr. 275.][2]

Circuit Court, E. D. Pennsylvania. April Term, 1849.[3]

COURTS — JURISDICTION—LOCAL ACTIONS — CORPORATIONS—RIGHTS OF PENNSYLVANIA AND NEW JERSEY IN THE DELAWARE — LICENSE AS DISTINGUISHED FROM GRANT.

1. A Pennsylvania plaintiff may sustain an action in this court in New Jersey against a corporation chartered by the latter state, for consequential injuries done to the plaintiff's real property lying in Pennsylvania, the cause of the injury—a canal—being in New Jersey.

[Cited in Mannville Co. v. City of Worcester, 138 Mass. 90. Cited in brief in Mason v. Warner, 31 Mo. 509.]

2. A corporation is private, as distinguished from public, unless the whole interest belongs to the government, or the corporation is created for the administration of political or municipal power.

[Cited in Putman v. Ruch, 56 Fed. 418.]

3. The proviso in the Pennsylvania and New Jersey act of 1771 (section 7), by which those states, in declaring the Delaware river a common highway, and authorising the improvement of it by commissioners, provided that no power given by the act should give power "to remove, throw down, lower or impair, or in any manner to alter" certain mill dams, nor to obstruct or "in any manner hinder" the owners of them, or "their heirs and assigns, . . . . . from taking water out of the said river for the use of the said mills," is not a grant of the water, but the toleration of a nuisance, and a mere license, revocable at pleasure, to use the water.

[Cited in Backus v. City of Detroit, 49 Mich. 114, 13 N. W. 382.]

In the year of 1771, the provinces of Pennsylvania and New Jersey respectively passed an act—Act Pa. March 9, 1771 (1 Smith's Laws, 322); Act N. J. Dec. 21st (Allinson's Laws, 347)—declaring the river Delaware which separates them to be "a common highway, for the purposes of navigation," and appointing commissioners with full power and authority to remove all obstructions in the channel, whether natural or artificial. One section of the law enacts that no person shall presume to divert, lead or draw, by any race or other device, any of the water of the river from its natural course for the use of any mill or water work. Another section authorises an indictment for maintaining any dam, with a proviso, however, in the act, that nothing in it should give power or authority to the commissioners to remove, throw down, lower, impair, or in any manner to alter a mill-dam erected by Adam Hoops, in the said river; or any mill-dam erected by any other person or persons in the said river, before the passing of this act, "nor to obstruct, or in any manner to hinder the said Adam Hoops, or such other person or persons, his or their heirs and assigns, from maintaining, raising, or repairing the said dams respectively, or from taking water out of the said river for the use of the said mills and water works." The mill and water works of Mr. Hoops were on the Pennsylvania shore, just opposite Trenton, and were fixed there before the passage by either state of the act of 1771.[4]

In the years 1830 and 1831, the state of New Jersey incorporated the defendants, giving them power to make a canal from the waters of the Delaware to the waters of the Raritan (that is across the state of New Jer-

---

[1] For the report of the following case the author is indebted to the excellent brief and notes of A. I. Fish, Esq., of the Philadelphia bar, one of the learned counsel who assisted in the case at Trenton.

[2] [Reported by John William Wallace, Esq.]

[3] [Affirmed in 14 How. (55 U. S.) 80.]

[4] At Trenton the stream of the river meets the tide, and there is a fall of over nine feet when the tide is out, and over five feet at high water. A small island lies near the Pennsylvania shore, extending from tide water toward the head of the falls. Mr. Hoops owned the land on the western margin of the river, and erected a dam between this island and the shore, in the margin of the tide water. The island thus served as a wing dam, and gave him the benefit of the fall of the river for the mills which he had erected on his land.

sey,) and "to supply the said canal with water from the river Delaware by constructing a feeder, which shall be so constructed as to form a navigable canal not less than thirty feet wide and four feet deep, and to conduct the water from any part of the river Delaware."

The corporation, besides the usual powers of corporations, and particularly of those relating to corporations for internal improvements, had generally such power as was "necessary to perfect an expeditious and complete line of communication from Philadelphia, and to carry the objects of this act into effect." The capital stock was fixed at one million of dollars, with right of increase to a million and a half; divided into shares of a hundred dollars each; three-fourths of which were opened to be subscribed for by the publick generally; the state of New Jersey reserving a right to subscribe for one-fourth, or any less sum. There were nine directors, of whom the state was to appoint two, if she subscribed for a fourth part of the stock, or one, if for a less sum. The state has the right of taking possession of the canal, if the company abandoned or failed to keep it in repair for three successive years: and also at the end of thirty years to take possession of it on paying its worth at an appraisement to be provided for. The company did accordingly make a canal, diverting the water from the river Delaware about twenty miles above Mr. Hoops' mill dam, that is to say, about twenty miles above Trenton, the place to which the tides in the Delaware are able to rise. The plaintiffs who had succeeded to Mr. Hoops' right, now brought this action on the case, in the New Jersey district, for injury to their mills in Pennsylvania, by the consequent diversion of the water.

On demurrers these three points arose:

I. Whether the action was properly brought in the New Jersey district; or whether, as the real estate, the subject of the injury, was in Pennsylvania, and the injury was experienced there, the suit ought not to have been brought in the Pennsylvania district.

II. Whether, admitting the jurisdiction, the defendants were not a publick corporation, as distinguished from a private one;—and so, the agents and officers of the state of New Jersey discharging a duty imposed upon them by publick law, and thus not liable to action from individuals in the courts.

III. Whether, admitting both the jurisdiction of the court and the general liability of the defendants for injuries done by their canal, the act of 1771 gave Mr. Hoops and his assignees any such grant of the water of the Delaware as enabled him or them to recover damages for a diversion of it injurious to his property, it not being admitted by the defendants that the navigation of the river was injured by the diversion.

To understand this last point fully it is necessary to make a short historical state-ment concerning the river and the appropriation of its water.[5]

It has been generally understood by the profession that the river Delaware and its islands were not included in the royal proprietary charter of either Pennsylvania or New Jersey, but that the property in them remained in the crown, till by the Revolution of 1776 they passed equally to New Jersey and Pennsylvania. After this event, that is to say, in 1783, the two states entered into an agreement by which, among other things, it was declared that the river from the north-west corner of New Jersey, southwardly, to the circular boundary of the state of Delaware, "in the whole length and breadth thereof, is and shall continue to be and remain a common highway, equally free and open for the use, benefit and advantage of the said contracting parties." It was also declared by this agreement that each state should "enjoy and exercise a concurrent jurisdiction within and upon the water" of the said river.

Under these notions and enactments, both states it appeared, and Pennsylvania in a particular degree, had used the waters of the river by common agreement until 1815 without dispute. On the 4th Feb. in the last named year New Jersey passed an act authorizing Coxe and others to erect a wing-dam in the river, and divert the water for the purpose of turning mills and other machinery. This seemed to be the first exercise of an authority over the river by one state without the assent and ratification of the other. It called forth a protest from the legislature of Pennsylvania, on the 21st of February, 1815; followed by a

---

[5] The following statements and public proceedings illustrative of the whole river history from 1761 to 1848, were collected and cited by J. M. Read, Esq., and are here arranged and preserved for reference by the profession in future cases: 1 Smith, Laws Pa. (1761) 235; Id. (1768) 280; Id. (1771) 324; Id. (1773) 406; Id. (1774) 416; Id. (1776) 363; Id. (1781) 515; 2 Smith, Laws Pa. (1782) 43; Id. (1784) 90; Id. (1785) 311; 3 Smith, Laws Pa. (1791) 24; Id. (1793) 93; Id. (1801) 462; 4 Smith, Laws Pa. (1803) 20; Id. (1804) 118; 5 Smith Laws Pa. (1809) 5; Pa. H. J. (1814–15) pp. 537–557; Pamph. Laws N. J. (1815) p. 190; Pa. H. J. (1816–17) pp. 537–557; 6 Smith, Laws Pa. (1817) 422–503; Pa. H. J. (1817–18) p. 131; Pamph. Laws Pa. (1819) 261; Pamph. Laws N. J. (1820); 7 Smith, Laws Pa. (1821) p. 393; 2 Harr. Comp. N. J. (1824) 71; Pamph. Laws Pa. (1825) 144; 9 Smith, Laws Pa. (1826) 103; Id. (1827) 332; Pa. H. J. (1827–28) p. 101; 10 Smith, Laws Pa. (1828) 112–175; Pa. H. J. (1828–29) p. 312; 2 Harr. Comp. N. J. (1829) 246; N. J. Ass. Min. (1829) pp. 126–141; 10 Smith, Laws Pa. (1829) 408; Pa. H. J. (1829–30) pp. 198, 204, 209, 225, 293; Pamph. Laws Pa. (1830) 129–218; Id. (1831) 216; 2 Pa. H. J. (1831–32) pp. 117, 123, 227; Pamph. Laws Pa. (1832) 638; Pa. H. J. (1832–33) p. 184; Id. (1833–34) Append. 209; N. J. Ass. Min. (1834) p. 19; 2 Pa. S. J. (1834–35) pp. 50–52, 74, 105, 106, 663, 664; N. J. Ass. Min. (1835) p. 228; Pamph. Laws Pa. (1839) 371; Id. (1841) 344–437; 3 Pa. H. J. (1842) p. 49; Pamph. Laws Pa. (1843) 237–241; Id. (1844) 554; Id. (1845) 502; Ex Doc. Pa. (1846); 2 Pa. Sen. J. pp. 25, 26; Pamph. Laws Pa. (1846) 408; Id. (1847) 355; Ex. Doc. (1847); Pamph. Laws Pa. (1848) 46.

second remonstrance in 1816, and a proposition to submit the matter to the supreme court of the United States, which was refused by New Jersey. After numerous messages and remonstrances between the governors and legislatures, commissioners were mutually appointed to compromise the dispute; but they failed to bring the matter to any conclusion. The dispute was never settled, and the wing-dam remained in the river.

In 1824, the state of New Jersey passed the first act for the incorporation of the Delaware and Raritan Canal Company, for which the company gave a bonus to the state of $100,-000. [Laws 1824, p. 175.] This act required the consent of the state of Pennsylvania; and on application being made to her legislature, she clogged her consent with so many conditions, that New Jersey refused to accept her terms, returning the bonus to the company; and so the matter ended for that time.

Both parties then appointed commissioners to effect, if possible, some compact or arrangement, by which each state should be authorized to divert so much of the water, as should be necessary for their contemplated canals. After protracted negotiations, these commissioners finally in 1834 agreed upon terms, but the compact proposed by them was never ratified by either party.

In the meantime each state appropriated to itself as much of the waters of the river as suited their purpose. In 1827 and 1828, Pennsylvania diverted the stream of the Lehigh, a confluent of the Delaware, and afterwards finding that stream insufficient, took additional feeders for her canal out of the main stream of the Delaware. On the 4th of February, 1830, the legislature of New Jersey passed the act under which the defendants were incorporated, and in pursuance of which they have constructed the dam and feeder, the subject of the present suit. [Laws 1830, p. 73.]

It did not appear that after this date, either state had strongly interfered to prevent the use of the water by the other: though the abstract right to do so had never been relinquished by Pennsylvania. The tide not flowing above Trenton, and ordinary boats not being able, in consequence of a fall in the river there to go above that place, the upper part of the river had become of comparative unimportance as a common highway: being important chiefly for bringing lumber down in the spring of the year, when the rains always make the river full, in spite of all artificial diversions which it would be possible to make. While on the other hand, the canals in both states supplied from the river, are intimately and extensively connected with their trade, revenues, and general prosperity.

Mr. Vroom and Mr. Ashmead, for plaintiff.

I. As to the jurisdiction: It is conceded that the river is a common boundary, and of common jurisdiction; that the water drawn off is drawn off from Pennsylvania, and that the canal which draws it lies in New Jersey. If this were an ejectment for the mill, or any other action in rem, the suit would have to be brought in Pennsylvania. But it is not so. It is a suit for damages caused by digging a canal; and that canal lies in New Jersey. Even admitting that the action were local, yet, says Lord Coke, "where the action is founded on two things done in several counties and both are material and traversable, and the one, without the other, does not maintain the action, the plaintiff may bring his action in which of the counties he will." [6]

II. As to the character of the corporation. The Delaware and Raritan Canal Company is not the state of New Jersey, nor the agent of the state. It is a mere collection of individuals erected into a corporation for the more easy transaction of their business. These individuals, at their own suggestion, and for their own benefit, have obtained a capacity of perpetual existence with other incidents of corporate character, and that is all. Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 518; Bonaparte v. Camden & A. R. Co. [Case No. 1,617]. The state has imposed no duty upon them. They are not acting for the state, nor by any order of the state. They are therefore not protected as public agents. The case of Ten Eyck v. Delaware & R. Canal Co., in the supreme court of New Jersey, is upon the same charter, and decides the exact point. 3 Har. [18 N. J. Law] 202. And see Governor, Etc., v. Meredith, 4 Term R. 794; Boulton v. Crowther, 2 Barn. & C. 703; Hall v. Smith, 2 Bing. 156; Sutton v. Clarke, 6 Taunt. 29.

III. As to the right of the defendants to take the water: Mr. Hoops, by the proviso to the act of 1771, had a grant from both states prior to the act of partition between them in 1783. The former act, while giving power to the commissioners to improve the channel, provides that nothing in the act should give any power or authority * * * "in any manner to alter" this dam * * * "nor to obstruct or in any manner to hinder" Mr. Hoops, his "heirs or assigns," from maintaining, raising or repairing the said dam, or from taking water out of the said river for the use of said mill and water works."

The construction of this is, that it was a right to place in the river a dam to be raised, repaired and maintained. It is not a mere license; nor temporary and personal. The

---

[6] Syllabus to Bulwer's Case, 7 Coke, 2. And see Mayor, etc., of London v. Cole, 7 Term R. 583, and Oliphant v. Smith, 3 Pen. & W. 181. Cases bearing incidentally upon the subject so far as to prove the right to make an election in many cases sounding in damages, between the place where the injury was sustained and the place where the person is,—are: Gawen v. Hussee, 1 Dyer, 38; Earl of Shaftsbury v. Graham, 1 Vent. 364; Thursby v. Plant, 1 Saund. 237; Russel v. Succlen, 1 Sid. 218; Gregson v. Heather, Fortes. 366; Bellasis v. Burbriche, 1 Ld. Raym. 171; Scott v. Brest, 2 Term R. 240; Rex v. Burdett, 4 Barn. & Ald. 95. And American cases, Foster v. Baldwin, 2 Mass. 569; Marshall v. Hosmer, 3 Mass. 23; Smith v. M'Iver, 9 Wheat. [22 U. S.] 532.

subject to be protected was permanent, requiring great outlays to profit by the privileges of the proviso. The object was permanent. "Heirs and assigns" are words of permanency. It is not necessary, in construing an act of legislation that there should be technical words of grant. Both states, by the act of 1771, surrendered their right to Hoops. That is enough. When acted upon, the right became an executed grant, and was the property of Hoops forever. As a "contract," it could not be "impaired." Fletcher v. Peck, 6 Cranch [10 U. S.] 87, 135; New Jersey v. Wilson, 7 Cranch [11 U. S.] 164; Green v. Biddle, 8 Wheat. [21 U. S.] 92; People v. Platt, 17 Johns. 195,—the last a case protecting the grant of a river.

Even if the proviso in the act of 1771 were a license only, yet having been acted upon and been the subject of great outlays, it is irrevocable. Winter v. Brockwell, 8 East, 308.

If the proviso were not itself a grant, yet in favour of so ancient and uninterrupted a possession and so long an enjoyment it will be held to be evidence of a grant, or of a right as good as grant. We claim by prescription for between seventy and eighty years. Twenty years are enough for presumption of a grant. Bealey v. Shaw, 6 East, 208; Balston v. Bensted, 1 Camp. 463; Tyler v. Wilkinson [Case No. 14,312]; Haight v. Morris Reservoir [Id. 5,902],—cases all of them, relating to the enjoyment of waters.

But even if the act of 1771 had never been passed we deny the right of New Jersey, or its creatures or agents, to drain the Delaware of its waters. In the river there is a community of rights, interests and privileges. The waters are indivisible. Both states hold them, all and every part of them, "per my and per tout," in trust as a publick highway for the benefit of the citizens of the Union. Neither state has a right to impair the navigation in any degree. The withdrawal of water to any appreciable amount impairs the navigation, and the amount here is clearly appreciable, for it has confessedly injured the plaintiff's mills. The navigation may not be practically injured now. Boats which now navigate might still navigate in a stream of half the size. But how will it be with larger boats, which future times may require? The river in future times will probably be navigated by the very largest boats that can navigate it at all. The least appreciable diminution of water may then be important. The right to lower the stream the hundredth part of an inch carries a right to divert or drain the river dry. There is but one rule on the subject, that is not to impair it at all.

J. M. Read, Mr. Green, and A. I. Fish, for defendant.

In an action on the case for injuries to real property, the party must seek his remedy where the injury is committed, and must lay his venue there. The distinction between local and transitory actions,—that is to say between such actions as operate in rem and such as sound in damages, merely,—is thoroughly settled, and cannot be shaken. Livingston v. Jefferson [Case No. 8,411]. That this is a local action, and as such subject to the laws which regulate that class of actions, is settled in Watt v. Kinney (23 Wend. 484; same case on appeal, 6 Hill, 82) in New York. C. J. Nelson, in the case says: "It appears to be conclusively settled that an action on the case for diverting a water course, so far savours of the realty as to be classed with local actions, and must be tried in the county where the injury happens."

The corporation is a publick one. Its purposes are publick. The state owns a large proportion of its stock and may before long become the proprietor of it all. The case of Ten Eyck v. Delaware & R. Canal Co., 3 Har. [18 N. J. Law] 200, in the supreme court of New Jersey, relied on by the other side, has not the highest authority. Vanderveer v. Same Defendants (Ms. Min. Ct. App. 1842) involved the same questions, and on an appeal from the decision of the supreme court which made a similar decision, the court of appeals was equally divided;—standing nine to nine. In a leading case in Pennsylvania (Monongahela Nav. Co. v. Coons, 6 Watts & S. 101, 114) the state had incorporated a canal company in no respect more public in its character than this one. See Act Pa. Leg. March 31, 1836 (Pamph. Laws, p. 282). It destroyed the plaintiff's mill-dam. The court held that however morally bound, there was no legal obligation to pay. "If the state," says C. J. Gibson, "would not be bound to pay, how is the defendant bound? The company acted by her authority." Yet the act of incorporation imposed no obligation to destroy the dam; nor was the company the agent of the state, any more than the defendants.

Unless Mr. Hoops has some such grant of the water as amounts to contract within the meaning of the constitution, he cannot sustain this suit any where. Now, on general principles, both of the common and the civil law, running water is common to all. Mason v. Hill, 5 Barn. & Adol. 1. And see Mayor, etc., v. Commissioners Spring Garden, 7 Pa. St. 355. The doctrine is recognized in the supreme court of New Jersey (Arnold v. Mundy, 1 Halst. [6 N. J. Law] 1, 61, 71, and 76), where it is said that by the law of nature navigable streams are common to every body, subject only to laws regulating their use, and that they cannot be aliened. The validity of even an express grant of the specific water might be questioned. But Mr. Hoops had no grant of any thing. The case is this: The act of 1771 declares the river a highway, and makes maintaining of any dam there an indictable offence. The proviso is but the exception of Mr. Hoops' dam from the general liability. If the proviso had not been insert-

ed the commissioners would have been bound to destroy the dam and indict Mr. Hoops for obstructing the highway which it was the object of the act to clear. The proviso then is but a license. It is moreover in derogation of general and paramount right in the community, and therefore must be construed strictly. But the value of this so called "grant" is not open to controversy here at all. Its precise value is settled in Pennsylvania; the supreme court of which state has declared that a license given by publick law to a riparian owner to erect a dam in a large navigable river and conduct the water upon his land for his own private purposes, is subject to any future provision which the state may make with regard to the navigation of the river (Susquehanna Canal Co. v. Wright, 9 Watts & S. 9; Monongahela Nav. Co. v. Coons, Id. 101); and "if the state authorize a company to construct a canal which impairs the right of such riparian owner he is not entitled to recover damages from the company." Now certainly the two states which tolerated the dam by the act of 1771 have made a new provision by the act of 1783, which parted the whole river between the two states. That act did in effect revoke the former license to Mr. Hoops.

The title by prescription which is relied on is equally unsound with that of express grant. "Like adverse possession, prescription does not prevail against sovereign powers who cannot apply the same vigilance which is reasonably required of private proprietors." Pea Patch Island Case [Case No. 10,872].

It is no part of this case that the navigation is impaired by the use which the defendants make of the river. They therefore trench upon no publick rights; and their private rights to use the water are just as good as those of any riparian owner. They may dip in the margin of the river, or draw the water in pipes or drains. So long as they do not impair the navigation of the river they are within the bounds of right.

The Delaware river being the joint property of both states, Mr. Hoops and his assigns own no part of it either above or below where the tide flows. [Case No. 474.] Navigable water in Pennsylvania does not mean tide water merely. Every part of the Delaware river—above Trenton as well as below it—belongs to the commonwealth, not to the riparian owner. The rule of the civil law, not of the common law, prevails in that state. Carson v. Blazer, 2 Bin. 475. If the water has been diverted to the injury of her citizens, the state of Pennsylvania alone would have a right to complain. But that state is estopped by her own acts. She has diverted entire confluent streams from the waters of the Delaware. She has taken directly from the main stream large supplies of water for her canals and publick improvements, without asking or obtaining the sanction of New Jersey.

GRIER, Circuit Justice. The first question in the order in which they have been argued with much learning and ability, is that affecting the jurisdiction of this court over the subject matter of the suit.

Originally all actions were tried in the proper county in which they arose, pursuant to the maxim, "Vicini vicinorum facta presumuntur scire." Now all personal actions, as debt, detinue, assault, deceit, trover, &c. may be brought in any county. But actions real and mixed, as trespasses quare clausum fregit, ejectment, waste, &c. must be laid in the counties where the land lies, and if not so laid, it is cause of demurrer. 1 Bac. Abr. tit. "Actions Local and Transitory," A. This distinction between actions local and transitory, is still maintained (Livingston v. Jefferson [Case No. 8,411]) even at the expense of a failure of justice. The present is undoubtedly to be classed with local actions. But it often happens that indictments for criminal offences, and actions on the case for injuries to real property and other cases local in their nature, are founded upon things done in two or more counties, which are necessary to constitute the offence. Formerly where a nuisance was done in one county to lands lying in another, an assisa in confinio comitatus lay at common law. Fitzh. Nat. Brev. 183, 184. "And albeit," says, Lord Coke, "the counties do not adjoin, but there be twenty counties mean between them, yet the assize in confinio comitatus doth lie, and the justices shall sit between the said counties." Co. Litt. 154a. And if a declaration contained matters lying in two counties, it was tried by both counties on a venire directed to the sheriff of both counties, who summoned six of each county. But such proceedings have long been obsolete and the doctrine established in Bulwer's Case, 7 Coke, 2a, has ever since been held as law both in England and this country: "That where the action is founded on two things done in several counties and both are material and traversable, and the one without the other doth not maintain the action, then the plaintiff may bring his action in which of the counties he will." Thus, if a man does not repair a well in Essex which he ought to repair, whereby my land in Middlesex is drowned, I may bring my action in Essex, for there is the default as it is adjudged, in 7 Hen. IV. pl. 8, or I may bring it in Middlesex, for there I have the damage, as is proved by 11 Rich. II., 'Action sur the Case,' 36." Gawen v. Hussee, 1 Dyer, 38a; Scott v. Brest, 2 Term R. 241; Mayor, etc., v. Cole, 7 Term R. 583; Rex v. Burdett, 4 Barn. & Ald. 95; Oliphant v. Smith, 3 Pen. & W. 180.

It has been objected to the application of this doctrine, to the present case, that it refers to counties which adjoin, and not to sovereign states. This is a distinction, it is true, between the cases cited and the present, but we have heard no reason given why it should make a difference. Actions may be maintained in the courts of New Jersey by a Pennsylvanian to recover a debt or damage for a personal injury: And why not for an injury to real property? The answer must be, because

the action is local and not transitory. The difficulty is caused not by any principles of international law, but by the common law, which is the same in both states. By the common law then, it must be solved. The objection is founded not on the plaintiff's right to a remedy, but on the mode of trial; and is after all but an objection to the venire. But I have shown that the venire is well laid in New Jersey, (which as regards this court forms one county) because the nuisance complained of was created in that state. If then the action be local, and this its proper venue, what is the value of the distinction? The plea to the jurisdiction must therefore be overruled.

Are the defendants then a publick corporation and therefore as publick officers who have acted within the scope of their authority and without malice or oppression, not liable for consequential injury? Where a party attempts to justify under a publick law, for a consequential injury inflicted on the property of another, he must show that he was a publick officer, in the performance of a duty imposed upon him by law; that he did not exceed his authority, but acted according to the best of his skill and judgment, doing that only which it was his duty to do. Governor, etc., v. Meredith, 4 Term R. 794; Sutton v. Clarke, 6 Taunt. 29; Boulton v. Crowther, 2 Barn. & C. 703; Hall v. Smith, 2 Bing. 156.

In the popular meaning of the term nearly every corporation is publick, inasmuch as they are all created for the publick benefit. Yet if the whole interest does not belong to the government, or if the corporation is not created for the administration of political or municipal power, it is a private corporation. Thus all bank, bridge, turnpike, rail road, and canal companies are private corporations. In these and other similar cases, the uses may in a certain sense be called publick, but the corporations are private, as much so as if the franchises were vested in a single person. Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 669. The state by virtue of its right of eminent domain, may take private property for publick purposes upon making compensation. It may delegate this power to a private corporation by reason of the benefit to accrue to the publick, from the use of the improvements to be constructed by the corporation. But such delegation of power to be used for private emolument as well as publick benefit, does not clothe the corporation with the inviolability or immunity of publick officers performing publick functions.

In the case of Ten Eyck v. Delaware & R. Canal Co., 3 Har. [18 N. J. Law] 204, the supreme court of New Jersey in their opinion delivered by Nevius, J., speaking of the corporation defendant in this case, very correctly say: "Whatever may have been the objects of this corporation, whether to erect a publick navigable highway, or to improve the navigation of the Raritan river, or whether the publick have the right to the use and enjoyment of these improvements when made

or not, the company are essentially a private company, and are not the agents of the state. Their works are not constructed by the requirement of the state. The state could not compel the company to construct this canal. It has permitted them to do so at their own request. The whole scope of their charter indicates clearly, that the legislature did not intend to interfere with private and vested rights, without providing a recompense to be paid by the company and not by the state; and if the injury or damage has accrued to the private property or rights of others, which could not be foreseen or anticipated, and are therefore not provided for in the charter of the company; this constitutes no reason why the party thus injured should not be compensated."

As an exposition of the law of this state, this case is binding on this court; and we fully concur in the principles of law laid down by the judge who delivered the opinion of the court. And see Sinnickson v. Johnson, 2 Har. [17 N. J. Law] 150; Stevens v. Proprietors of Middlesex Canal, 12 Mass. 466; and Crittenden v. Wilson. 5 Cow. 165.

The case of Monongahela Nav. Co. v. Coons, 6 Watts & S. 101, in Pennsylvania, has been relied upon as establishing a contrary doctrine. It is true. that in that case, the Monongahela Navigation Company was a private corporation. They had power to make a slack water navigation in the Monongahela river, by the erection of dams and locks in the same; and the act of incorporation required them to make compensation for injuries done to private property on the Monongahela, but made no provision for compensation for like injuries on the Youghiogany its confluent, ·because the company were not empowered to back the water or affect its natural flow in the Youghiogany. But the company ·-- the erection of a dam in the Monongahela below the mouth of the Youghiogany. destroyed a mill erected on that stream, under a license from the commonwealth, and were held not liable to make compensation. But this case seems founded on doctrines peculiar to the courts of Pennsylvania; and although in the determination of points hereafter to be considered in this case, it will be quoted as binding authority; for the purposes of the question now under consideration, we must be governed by the law as established by the courts of New Jersey.

If therefore, the plaintiff's claim for damages in this case, had arisen from the flooding of his land either on the New Jersey or Pennsylvania side of the river, by the dam or wing wall erected by defendants for the purpose of feeding their canal; or for injury to a mill erected on a private stream by flowing back the waters of the river; the case would probably have ended here, and the plaintiff been entitled to judgment.

But the injury alleged does not arise from either of these causes. The plaintiff's mill

is situated twenty miles below the head of the canal or feeder and the dam erected by defendants; and the injury complained of arises from the diversion of the water of the Delaware and its confluents; thereby diminishing the flow of water to the plaintiff's mill.

By the section of their charter quoted in Rundle v. Delaware & R. Canal [Case No. 12,139] the defendants have the authority of the state of New Jersey, for diverting the water of the river Delaware for the purpose of canal navigation.

In order then to ascertain the plaintiff's right to recover for any injury alleged to be consequential upon such diversion, we must enquire: 1. To whom do the channel and waters of the river Delaware belong? 2. What are the rights of the plaintiff as riparian owner, in the said river, according to the laws of Pennsylvania? 3. Have they any title to the waters of said river or the use of their mills, by grant from the states of Pennsylvania and New Jersey, or either of them? 4. Had the state of New Jersey a right to divert the waters of the Delaware for the purpose of canal navigation without the consent of Pennsylvania? 5. And whether or not, has the plaintiff a right to dispute their power or to raise that question in the present controversy?

The river Delaware is the boundary between the states of Pennsylvania and New Jersey. The tide ebbs and flows to the part of the Trenton Falls where the Trenton bridge crosses the river. Above that point it is a fresh water stream. Previous to the Revolution, the channel and waters of the river below Trenton, so far as the river was navigable in the common law sense of the term, were vested in the king of England. The grant both for New Jersey and for Pennsylvania was bounded by the river Delaware. So far as the tide ebbed and flowed, these proprietors had no title to the bottom of the river below low water mark. But above the bridge and the flow of the tide, the proprietors of each province, held ad filum medium aquæ, by the established principles of the common law, according to which their respective grants must be construed. So far as the river was the property of the crown, it devolved on the two states by the Revolution, and the treaty of peace with Great Britain. Immediately after the treaty of peace, the states of Pennsylvania and New Jersey entered into the compact of April, 1783, making the Delaware a common highway for the use of both states.

Without referring to the very numerous acts of assembly of the two states with regard to this river, which have been brought to our notice by the industry and research of the learned counsel, it will be necessary for the purposes of this case, to notice only a few of the more prominent points of its history from that time till the present.

For thirty years after the compact the states appear to have enjoyed their common property without any dispute or collision. When the legislature of either state passed any act affecting it, they requested and obtained the consent and concurrence of the other. The first dispute which arose on the subject was caused by an act of the legislature of New Jersey, passed on the 4th of February, 1815. His honour here went into a short narrative of this part of the river history, in very nearly the same words in which it appears in the statement of the reporter, who has adopted it in the preliminary part of the case. His honour then continued: Indeed it would seem as if the river had become of little comparative importance, as a common highway, being used only for descending navigation in the spring of the year, when the banks are full and the subtraction of the water for artificial navigation causes no sensible diminution, or materially affects the navigation of the stream. The practical benefits resulting to both parties from their great publick improvements have convinced them that further negotiations, complaints or remonstrances are useless and unreasonable; and thus by mutual acquiescence and tacit consent the necessity of a more formal compact has been superseded.

After the brief summary presented by the reporter's statement, and in the remarks which I have just made of the transactions between the states concerning this river, their common boundary and property, let us now inquire whether the plaintiffs have shown any title to the channel of the river and the use of the waters flowing therein which will enable them to support an action against persons authorized by either of the states to divert the waters of the river for the use of their great publick improvements.

In 1771 Mr. Hoops, at that time owning the Pennsylvania shore, and having erected his dam there, in the manner already described, the legislatures of the provinces of New Jersey and Pennsylvania passed concurrent acts declaring the river Delaware a "common highway for the purposes of navigation." By these acts commissioners were appointed and authorized to remove all obstructions in the channel, whether natural or artificial, with the proviso whose effect has been one of the subjects of argument.

By the common law of England a river is defined as navigable so far only as the tide flows. The soil under a navigable river does not belong to the owners of the adjoining banks. But fresh water streams of what kind soever belong of common right to the owners of the adjacent soil.

The water may be under a servitude to the publick as a highway, but still the channel of the river to its central line belongs to the riparian owner who by reason of his title to the land over which it flows has an usufruct in the water as it passes, provided he does not obstruct the publick use as a highway. And if before it was declared a highway,

he had erected mills or made other use of the stream as it flowed over his land, and his mills or other works are injured or impaired by such seizure to a publick use, he is entitled to remuneration as much as if houses or other land had been so taken. And if an individual or a corporation should divert the water flowing on his land to his injury, they could not plead this exercise of the eminent domain granted to them by the state as a justification for taking the private property of the citizen without compensation.

But the law of Pennsylvania by which the title and rights of the plaintiffs must be tested, differs materially from that of England and most of the other states of the Union. As regards her large fresh water rivers she has adopted the principles of the civil law in preference to that of England. In the case of Carson v. Blazer, 2 Bin. 475, the supreme court of that state decided that the large rivers, such as the Susquehanna and Delaware, were never deemed subject to the doctrines of the common law of England applicable to fresh water streams, but that they are to be treated as "navigable" rivers: that the grants of William Penn, the proprietary, never extended beyond the margin of the river, which belonged to the publick, and that the riparian owners have therefore no exclusive rights to the soil or water of such rivers ad filum medium aquæ.

In Shrunk v. President, etc., of Schuylkill Nav. Co., 14 Serg. & R. 71, 80, the same court repeat the same doctrine; and Chief Justice Tilghman in delivering the opinion of the court observes: "Care seems to have been taken from the beginning to preserve the waters of these rivers for publick uses both of fishery and navigation; and the wisdom of that policy is now more striking than ever from the great improvements in navigation, and others in contemplation, to effect which it is necessary to obstruct the flow of the water in some places and in others to divert its course. It is true that the state would have had a right to do these things for the publick benefit even if the rivers had been private properties; but then compensation must have been made to the owners, the amount of which might have been so enormous as to have frustrated or at least checked these noble undertakings."

In the case of Monongahela Nav. Co. v. Coons, 6 Watts & S. 101, before referred to, Coons had erected his mill under a license given by an act of the legislature in 1803, riparian owners to erect dams of a particular structure, "provided they did not impede the navigation," &c. The Monongahela Navigation Company, in pursuance of a charter granted them by the state, had erected a dam in the Monongahela which flowed back the water on the plaintiff's mill in the Youghiogany and greatly injured it. And it was adjudged by the court, that the company were not liable for the consequential injury thus inflicted. Chief Justice Gibson speaking of the rights of plaintiff consequent on the license granted by the act of 1803 observes (page 112): "That statute gave riparian owners liberty to erect dams of a particular structure on navigable streams without being indictable for a nuisance, and their exercise of it was consequently to be attended with expense and labour. But was this liberty to be perpetual and forever tie up the power of the state? Or is not the contrary to be inferred from the nature of the license? So far was the legislature from seeming to abate one jot of the state's control, that it barely agreed not to prefer an indictment for a nuisance except on the report of viewers to the quarter sessions. But the repeal of a penalty is not a charter, and the alleged grant was nothing more than a mitigation of the penal law. The statute is pro tanto a repealing one, which offers no express compact to any one. It was ruled in Charles River Bridge v. Warren Bridge, 11 Pet. [36 U. S.] 420, that the state is not presumed to have surrendered a publick franchise, in the absence of proof of an unequivocal intention to do so. It would seem that the publick dominion may be parted with, but not without an explicit renunciation of it. And this relieves the case from the pressure of that clause of the constitution, which declares that no state shall pass a law impairing the obligation of contracts."

The case of Susquehanna Canal Co. v. Wright, 9 Watts & S. 9, confirms the preceding views and decides that the state is never presumed to have parted with one of its franchises in the absence of conclusive proof of such an intention. Hence a license accorded by a public law to a riparian owner to erect a dam on the Susquehanna river and conduct the water upon his land for his own private purposes is subject to any future provision which the state may make with regard to the navigation of the river. And if the state authorize a company to construct a canal which impairs the rights of such riparian owner, he is not entitled to recover damages from the company. In that case Wright had erected valuable mills under a license granted to him by the legislature; but the court say (page 13): "He was bound to know that the state had power to revoke its license whenever the paramount interests of the publick should require it. And in this respect a grant by a publick agent of limited powers, and bound not to throw away the interests confided to it, is different from a grant by an individual who is master of the subject. To revoke the latter after an expenditure in the prosecution of it would be a fraud. But he who accepts a license from the legislature, knowing that he is dealing with an agent bound by duty not to impair a publick right, does so at his risk; and a voluntary expenditure on the foot of it gives him no claim to compensation."

Without expressing any approbation of the doctrines established in the two last cited

cases, we are nevertheless bound to say, that they settle authoritatively and conclusively the question now under consideration. They apply also with double force to the present case, as no valuable improvements have been made by the plaintiffs on the faith of a legislative license. It has been contended that the proviso in the joint acts of the legislatures of Pennsylvania and New Jersey of ·1771, already referred to. operated by way of grant to Adam Hoops, his heirs and assigns, of a right to divert the water of the· river Delaware to his mills. But we can discover nothing in the nature of a grant in the words of this proviso. It amounts to no more than the present toleration of a nuisance previously erected; and at most to a license revokable at pleasure. The doctrine of the cases which we have just quoted. applies to it with full force and conclusive effect.

Nor can the plaintiff claim by prescription against the publick for more than the act confers on him. which, at best, is but impunity for a nuisance.

We are of opinion also, that it is not competent for the plaintiff to question the authority of New Jersey to take the waters of the Delaware for her publick improvements without the consent of Pennsylvania. The channel and waters of this river are vested in the two states as tenants in common, as we have already seen; and no one can question the authority of either to divert its waters but the other. Pennsylvania was the first to seize on a portion of their joint property, for her separate use, and is estopped by her own act from complaint against New Jersey, who has but followed her example. Besides this, mutual consent may be presumed from mutual acquiescence. At all events the plaintiff, who is shown to have no title to the river or any part of it, and whose toleration or license could at best only protect him from a prosecution. is not in a situation to dispute the rights of either, or claim compensation for a diversion of its waters for the purpose of the publick improvements, of either of its sovereign owners.

It will be unnecessary to inquire whether the compact of 1783, operated as a revocation of the toleration or license granted by the act of 1771, to the dam of Adam Hoops; as that question can only arise in case of an indictment of it as a publick nuisance.

Judgment for defendant.

[This judgment was affirmed by the supreme court. where it was carried on writ of error. 14 How. (55 U. S.) 80.]

NOTE. The reporter is sure that no apology is requisite for appending to this report. and as connected with one point in the case. the following opinion of the late Richard Stockton, Esquire. of New Jersey; one of the ablest lawyers and statesmen whom our country has produced, and whose lofty honour both in his professional and political career deserves to be held in even higher remembrance than his uncommon abilities. The opinion is derived from the MS. collection of A. I. Fish, Esq. of the Philadelphia bar. Its value in connexion with the present case. is increased from the fact, that it was one of the opinions upon which the company proceeded upon their enterprize, and that it was not known to the court when its judgment was given. As Mr. Stockton died in March, 1828, it was, of course among the last opinions which he ever gave:

On the right of New Jersey to make a canal without first obtaining the consent of Pennsylvania to use the waters of the Delaware. The following positions it is believed are undeniable:

1. The river Delaware was not included in the ancient grants of the King of England and the Duke of York, either to the proprietors of New Jersey, or to William Penn, the proprietor of Pennsylvania, but the property therein and its islands. remained in the crown of England until the Revolution. The rights of private property claimed by individuals, on either side of the river, had no· other legal foundation but occupation or possession.

2. By the war of the Revolution, and the treaty of peace, New Jersey and Pennsylvania acquired a property therein equally; namely each state to the channel or middle of the river on its own side. The agreements between the two states as to jurisdiction, and the partition of the islands, recognize this position, and are bottomed upon it.

3. The property of each state to the middle of the river is as absolute as the subject matter permits. To the shores and the ground covered with water to the channel. it is as perfect and unlimited, as to other parts of its territory. The agreements referred to amount to a partition. Each holds its own in severalty; fully and entirely independent of the other.

4. There is nothing since remaining in common but the waters of the river, which are incapable of division. But a right of property in the waters of a river can only exist for appropriate uses, namely for navigation and transit—therefore the rights of navigation and passage remain common to the citizens of both states, over the entire river. and would have so remained without an express stipulation.

Then may not either state appropriate the waters washing her own shores to publick improvements? And what ·is the just limitation of the right if it exists? These questions depend upon the received law of nations—the only rule of action between independent states, and upon a just application of its principles to the subject before us. The most approved writers on the law of nations, consider the property in a river belonging to two states. as absolute in each, to its own half part—and content themselves, with laying down the limitations, to such absolute property. which rightfully arise out of the common claim to the waters of the river—and these limitations are made to depend upon that great principle of justice. adopted by all codes of law, that each must so use his own right as not to destroy or materially injure the right of the other. Vattel (Law Nat. bk. 1, c. 22. § 271) goes over these limitations. He says: "It is not allowable to raise works on the bank of a river to turn its course. and turn it on the opposite bank. In general, no person ought to build on a river or elsewhere. any work which is prejudicial to the right of another. If a river belongs to a nation, and another has the right of navigation. the first cannot form a dam or mill that shall stop its being navigable. Its right in this case is only that of limited property, and it cannot exert it. but by respecting the rights of others. Id. § 272. The right of navigation necessarily supposes that the river shall remain free and navigable, and therefore must exclude every work that will entirely interrupt its navigation." Id. § 273.

I am therefore of opinion that the state of New Jersey is under no legal necessity of asking the permission of the state of Pennsylvania to use the waters of the Delaware. for publick improvements. provided. that the navigation

and the right of passage are not thereby injured or interrupted.

This opinion has not been hastily formed, but is the result of as full an investigation as I could bestow upon the subject. It is believed that Pennsylvania has substantially acted upon this principle. It is said that from the Trenton Falls upwards, the waters are in many places diverted from their natural courses, for the accommodation of mills, without the consent of New Jersey. The Bristol canal is to be supplied by tapping the Lehigh river, near to the place where it empties itself into the Delaware. Now the principle that the owner of a river, has a right to insist that the waters of a tributary stream, shall not be diverted from its natural course, until it reaches its destination, is as fully established, as that the course or waters of the main river, shall not be altered or diverted: and the injury to New Jersey is precisely the same in this case as if the water was taken from the Delaware itself.

29th January, 1828.